



HOLLISTER LAW CORPORATION
GEORGE C. HOLLISTER, State Bar No. 137706
655 University Ave., Ste. 200
Sacramento, CA 95825
(916) 488-3400 (Telephone & Facsimile)
hollisterlaw@earthlink.net (E-mail)

Attorney for Chapter 11 Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
(SACRAMENTO DIVISION)

| | |
|---|---|
| In re: | ) Case No. 15-21575-A-11 |
| BR ENTERPRISES, a California General Partnership, | ) DCN: N/A |
| | ) **DEBTOR'S CHAPTER 11 DISCLOSURE STATEMENT [June 26, 2015]** |
| Debtor. | ) Hearing Date: August 10, 2015 |
| | ) Time: 10:00 a.m. |
| | ) Dept: "A" (Courtroom 28) |
| | ) U.S. Federal Courthouse |
| | ) 501 I Street, 7th Floor |
| | ) Sacramento, CA 95814 |

# Article I
## Introduction

BR Enterprises, a California General Partnership, Debtor-in-Possession in this Chapter 11 case (hereinafter "Debtor") provides this Chapter 11 Disclosure Statement (the "Disclosure Statement") to each of the Debtor's known Creditors. This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtor's Chapter 11 Plan of Reorganization (the "Plan") which has been filed with the United States Bankruptcy Court for the Eastern District of California (the "Court"). Court approval of the Disclosure Statement does not constitute a finding by the Court that the information provided by Debtor and contained in the Disclosure Statement is accurate.

Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code")[1] requires that at the time the Plan is delivered to the Debtor's creditors and interest holders, it must be accompanied by a Disclosure Statement. The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical creditor to make an informed judgment about the Plan and to enable such creditor or interest holder to determine whether it is in his or her best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtor strongly urges you to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, results of operations, management, properties, assets and liabilities as well as setting forth a separate summary of the Plan.

To vote to accept or reject the Plan a creditor must indicate his/her/its acceptance or rejection thereof on the ballot which accompanies this Disclosure Statement and return it to the Hollister Law Corporation, 655 University Avenue, Ste. 200, Sacramento, California 95825, Attention: George C. Hollister ("Debtor's Counsel") at the place and by the time and method specified on the ballot. Each class of creditors allowed to vote on the Plan will be deemed to have accepted if the Plan is accepted by valid ballots cast by creditors in that class holding at least two-thirds (2/3) in dollar amount and more than one half (1/2) in number of the allowed claims of creditors in that class actually voting on the Plan. Only properly executed ballots timely tendered to Debtor's Counsel will be counted as having voted on the Plan.

All claimants or interest holders whose claims or interests are left "unimpaired" by the Plan, as that term is defined in the Bankruptcy Code, are deemed to have voted in favor of the Plan. Therefore, they may not receive this Disclosure Statement, and they may not be

---

1 Except as otherwise indicated, all statutory references are to the Bankruptcy Code (Title 11 of the United States Code, §101 et seq.), hereinafter referred to as the "Bankruptcy Code."

allowed to vote on the Plan. In this instance, all classes of claims except Classes 4, 5 and 7 have been designated as "impaired" by Debtor.

Since mail delays may occur, and because time is of the essence, it is important that ballots be mailed well in advance of the date specified thereon. Any ballots received after that date will not be included in any calculation to determine whether the Debtor's creditors will be deemed to have accepted or rejected the Plan.

This is a solicitation by the Debtor, and not by the Bankruptcy Court, or by Debtor's attorneys or consultants, except as otherwise specifically indicated. No representations concerning the Debtor, including, but not limited to, representations as to its future operations, cash flow projections, the value of its properties, or any effect of the transactions proposed under the Plan, are authorized by the Debtor other than as set forth in this Disclosure Statement.

The court's approval of the Disclosure Statement only indicates that the Disclosure Statement contains adequate information for the purpose of solicitation of acceptances to the Plan by the Debtor.

## Article II
## Definitions

The definitions contained in the Bankruptcy Code are incorporated herein. Whether or not inconsistent with the definitions contained in the Bankruptcy Code, the following terms used in the Plan of Reorganization shall have the following meanings:

1.01. Allowed Administrative Claim: An Allowed Claim relating to the administration of the Case pursuant to Sections 503(b) and/or 507(a)(2) of the Code, including, without limitation, any fees of professionals employed in this Case which have been approved by the United States Bankruptcy Court, and any quarterly fees owing to the Office of the United States Trustee.

1.02. Allowed Claim: A Claim against Debtor or the Estate that has not been satisfied prior to the Effective Date, and is specifically designated as an Allowed Claim in the Plan, or arose or is deemed to have arisen before the Effective Date, and to the extent it is either (a) scheduled in the list of creditors prepared or filed with the Court by the Debtor and not listed as disputed, contingent or unliquidated as to amount, or (b) with respect to which a proof of claim has been filed by the Bar Date with the Court and as to which no objections have been filed by the (Claim Objection) Bar Date (see paragraph 1.11, below, and paragraph 9.04 of the Plan), or as to which any such objection has been determined by an order or judgment which has become final. If the claim arose after the Petition Date, (1) the claim is of a kind that can be voluntarily paid from the Estate without specific Court approval and is so paid within the later of 60 days after the Effective Date or 60 days after all materials that must be filed with or issued by the Court as a prerequisite to payment of the claim have been properly filed and served or issued or (2) the claim has been allowed by Final Order. Notwithstanding the foregoing, and except as otherwise provided in the Plan, no claim shall be deemed an Allowed Claim if such Claim includes attorneys' fees, default interest, late penalties or similar charges or costs of any kind,

accrued or incurred post-petition, unless the same have been approved by the Court, in accordance with the procedure set forth in Article IX, §9.01 of the Plan.

1.03. Allowed Guaranteed Unsecured Claims: An Allowed Unsecured Claim arising from the guarantee by Debtor on account of a claim against a third party.

1.04. Allowed Priority Claim: An Allowed Claim entitled to priority pursuant to Bankruptcy Code §§507(a) (4), (5), (6), (7), (9) or (10).

1.05. Allowed Priority Tax Claim: An Allowed Claim entitled to priority pursuant to Sections 507(a)(8) of the Code, including but not limited to any claim for a priority tax that was not assessed against Debtor until after the Petition Date as provided at Bankruptcy Code §502(i).

1.06. Allowed Secured Claim: An Allowed Claim secured by a lien, security interest or other charge against property in which this estate has an interest, or which is subject to set off under Bankruptcy Code §553, to the extent of the value - determined in accordance with Bankruptcy Code §506(a) - of the interest in such property, or such secured claim in the estate's interest in such property, or to the extent of the amount subject to any set off, as the case may be. Except as otherwise provided in the Plan, unpaid principal and all accrued interest shall be computed and aggregated as of the Confirmation Date and shall thereafter bear interest as provided for in the Plan or as allowed under applicable law or loan documents, whichever is applicable. Notwithstanding the foregoing, and except as otherwise provided in this Plan, no claim shall be deemed an Allowed Secured Claim if such Claim includes attorneys' fees, default interest, late penalties or similar charges or cost of any kind, accrued or incurred post-petition, unless the same has been expressly provided for in this Plan, or approved by the Court in accordance with the procedure set forth in Article IX, §9.01 of the Plan.

1.07. Allowed Unsecured Claim: Allowed Claims against the Debtor for which there are no assets of the Debtor serving as security, but excluding any Allowed Priority Claims.

1.08. Bankruptcy Code or Code: Title 11 of the United States Code, as amended. All citations in this Plan to section numbers are to the Bankruptcy Code unless otherwise expressly indicated.

1.09. Bankruptcy Court or Court: The United States Bankruptcy Court for the Eastern District of California or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11, Title 11, United States Code and all other applicable statutes, rules and regulations.

1.10. Bankruptcy Rules or Rules: The Federal Rules of Bankruptcy Procedure, as amended, and the local Bankruptcy Rules, as adopted, by the Court for use in the United States Bankruptcy Court for the Eastern District of California.

1.11. Bar Date: The term "Bar Date" refers to the deadline for filing proofs of Claims in this case, which deadline is June 25, 2015 for non-governmental creditors, and August 26, 2015 for governmental units.

1.12. Claim: The term "Claim" means: (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, known, unknown, legal, equitable, secure, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, known, unknown, secured, or unsecured.

1.13. Confirmation Date: The date upon which an order confirming the Plan is entered by the Clerk on the Court docket.

1.14. Debtor: BR Enterprises, a California General Partnership, in its capacity as Chapter 11 Debtor-in-possession (pre-confirmation/Effective Date) or as a Revested Debtor under a confirmed Chapter 11 Plan (post-confirmation/Effective Date).

1.15. Disclosure Statement: The Disclosure Statement prepared by the Debtor as required by Section 1125 of the Code and approved by an order of the Court.

1.16. Disallowed Claim: As used herein, the term "Disallowed Claim" means a Claim against Debtor or the Estate that is specifically designated as a Disallowed Claim in the Plan or by the Court, or arose or is deemed to have arisen before the Effective Date, to the extent that it is either (a) not scheduled in the list of creditors prepared or filed with the Court by the Debtor or accompanied by a proof of claim filed prior to the Claims Bar Date, (b) listed in the schedule of creditors filed by the Debtor with the Court as "disputed," "contingent" or "unliquidated" as to amount, and/or (c) with respect to which a proof of claim has been timely filed with the Court, (1) the proof of claim was not filed on or before the Claims Bar Date, or (2) the proof of claim was filed on or before the Claims Bar Date but an objection to the allowance thereof has been timely filed and sustained by final order of the Court. If the claim arose after the Petition Date, (1) the claim is of a kind that cannot be voluntarily paid from the Estate without specific Court approval and has not been paid within the later of 60 days after the Effective Date or 60 days after all materials that must be filed with or issued by the Court as a prerequisite to payment of the Claim have been properly filed and served or issued or (2) the claim has been disallowed by Final Order. Moreover, all claims for reimbursement or contribution against Debtor made by any co-debtor which was contingent as of the Petition Date shall be automatically disallowed effective as of the Confirmation Date pursuant to Bankruptcy Code §502(e).

1.17. Disputed Claims: As used herein, the term "Disputed Claims" refers to all Claims which Debtor intends to disallow in full or in part, including but not limited to the Claims referenced at Article VI of the Disclosure Statement.

1.18. Effective Date: The Effective Date of this Plan shall be the thirtieth (30th) calendar day following the Confirmation Date.

1.19. Final Order: The term "Final Order" means an order, including but not limited to a judgment, of the Bankruptcy Court, the District Court, any Appellate Court, Court of Appeal, or other judicial entity, as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the relevant time for appeal has expired and a notice of appeal has not been filed timely.

1.20. Guaranteed Claims: Claims of third parties guaranteed by Debtor.

1.21. Income: As used herein, the term "Income" means all consideration constituting Property of the Estate paid to and received by Debtor during the Plan Term.

1.22. Petition Date: February 27, 2015.

1.23. Plan: The Debtor's Chapter 11 Plan of Reorganization, in its entirety and all addenda, exhibits, schedules, releases and other attachments thereto, as the same may be amended or supplemented from time to time and any amendment or modification thereof.

1.24. Plan Term. The term "Plan Term" refers to the duration of the Plan, which, in this case, begins on the Petition Date and ends on the earlier of (i) Sixty (60) months from the Confirmation Date, or (ii) the date Debtor makes the last payment required under the Plan.

1.25. "Property of the Estate": The definition of "Property of the Estate" set forth at Bankruptcy Code §541 is incorporated herein by reference. In summary, Property of the Estate includes, but is not limited to, any and all rights, entitlements, claims, and/or causes of action, including rights of setoff or equitable, injunctive, or declaratory relief, against any other Person and/or property, including rights of indemnity and/or contribution, regardless of whether such claims, rights, entitlements, or causes of action are liquidated, unliquidated, contingent, noncontingent, disputed, undisputed, and/or barred or unenforceable for any reason, and includes all property, including earnings, acquired between the Petition Date and the date the case is closed, dismissed or converted, whichever occurs first.

1.26. "Real Estate": As used herein, the term "Real Estate" means all interests of the Debtor in real property as of the Petition Date.

1.27. Unclassified Claims: The allowed amount of:

(i) All Allowed Administrative Claims, and

(ii) All Allowed Priority Tax Claims.

1.28. Unsecured Claims: Claims against the Debtor for which there are no assets of the Debtor serving as security, but excluding any Allowed Administrative Claims, Allowed Priority Claims, and Allowed Priority Tax Claims.

**Article III**
**Voting Considerations**

Under the Bankruptcy Code, no one may solicit your acceptance or rejection of the Plan unless, at the time of or before such solicitation, there was transmitted to you a summary of the Plan, and a written, court approved Disclosure Statement containing adequate information. In particular, Bankruptcy Code §1125 (e) of the Code provides:

> (e) A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of the Title, or that participates, in good faith and in compliance with the applicable provisions of this Title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participation in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities. (11 U.S.C. 1125(e))

**It is important that you vote.** Whether or not a creditor votes on the Plan, such creditor will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed. Absent some affirmative act constituting a vote, non-voting creditors will not be included in the tally submitted to the Court in connection with the hearing on confirmation of the Plan.

In order to vote for or against the Plan, a Creditor must have filed a proof of claim on or before the Bar Date unless its Claim was scheduled in this case by Debtor without a notation that the Claim was disputed, unliquidated or contingent. Any such Creditor is, to the extent scheduled, deemed to have filed a Claim, and, absent objection, such Claim is deemed Allowed. In order to determine whether you are entitled to vote notwithstanding the failure to timely file a proof of claim, you should review the Debtor's Schedules D, E and F, on file with the Clerk of the Court and any amendments thereto. If your Claim is not scheduled, or if it is scheduled as contingent, disputed, or unliquidated and you did not or do not file a Claim prior to the Bar Date, you are not entitled to vote or to any distribution under the Plan.

Allowance of a Claim or interest for voting purposes does not necessarily mean that all or a portion of the Claim or interest will be allowed for distribution purposes. Any Claim in this case is subject to an order disallowing it for distribution purposes or for voting purposes on motion of any party in interest.

A Creditor entitled to vote may accept or reject the Plan by filling out and mailing to Debtor's counsel a ballot. Each Creditor is urged to promptly complete the ballot accepting the Plan and return it to Debtor's Counsel (Hollister Law Corporation, 655 University Avenue, Ste. 200, Sacramento, California 95825, Attention: George C. Hollister). Please be sure to properly complete the form and legibly identify the name of the Claimant thereon.

Any Creditor holding Claims in more than one impaired Class must file one ballot for each such Class. If you have received the incorrect ballot or if you believe you are entitled to vote in more than one Class, additional ballots may be obtained upon written request to Debtor's Counsel, or you may simply photocopy the ballot sent to you and mark it accordingly.

If the Plan is rejected by one or more impaired Classes of Claims, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other requirements, that the Plan does not discriminate unfairly and is fair and equitable with respect to the Class or Classes of Claims or interest impaired by the Plan. The Debtor, as the Plan proponent, will request such a determination (commonly referred to as a "cram-down"), if the Plan or modifications thereof is not accepted by all of the impaired classes of claims or interests held by creditors.

## Article IV
## Debtors' Background

A. Description & Status of the Debtor's Business Operations and Assets as of the Petition Date

BR Enterprises is a California general partnership. The partners are Antonio Rodriguez, Jr. (hereinafter sometimes "Rod Jr.") and Antonio Rodriguez III, Rod Jr's son (hereinafter sometimes "Rod 3") dba Gemini Investments, each owning fifty percent of the Debtor.

Real estate assets of the partnership include an approximate 3,100 acre cattle ranch (collectively the "Ranch") which includes numerous structures, two residences, irrigated land, grazing land, and an approximately 480 acre approved subdivision (Sunset Hills Subdivision) which is in various stages of entitlements. This 480 acres does not include approximately 600 additional acres of developable land all situated South of Lake California Drive, Tehama County, California, which have been approved as part of a phased Planned Development. Debtor also owns a residence in Indian Wells, CA, which is in in Riverside County.

Personal property includes @100 head of cattle, company vehicles, machinery and equipment used to maintain the Ranch and to grow and harvest hay, and a note receivable of approximately $4.2m (discussed in more detail at Article VI, below) owing from Shasta Enterprises, a California general partnership owned by Antonio Rodriguez, Jr. and his wife, Lorraine, which partnership filed its own Chapter 11 bankruptcy (Case #14-30833) in this Eastern District of California on October 31, 2014. Debtor also had approximately $166,550 in unencumbered cash in its bank accounts plus $96,718 in its bankruptcy attorneys trust account as of the Petition Date.

Debtor's schedules, amended June 11, 2015, reflect $14,411,042 in total assets as of the Petition Date - valued conservatively at either the Debtor's book value (personal property) or the tax assessor's value - against $4,361,491.66 in liabilities. The liabilities are attributed for the most part to the following three over-secured creditors:

(1) Central Valley Community Bank ("CVCB"). CVCB asserts in its proof of claim filed June 17, 2015 (Claim #5) to be owed $1,808,222 as of the Petition Date, secured by a first position deed of trust against the so-called "Main House" which sits on approximately 14 acres on the Ranch (hereinafter referenced as the "CVCB Collateral"). The assessed value (by the Tehama County Tax Assessor) of CVCB Collateral is referenced in Debtor's schedules at $3.8m. The CVCB Collateral is currently listed for sale at @$3.3m (see link to broker's website below). The loan to CVCB, originated May 2, 2008 in the amount of $2.3m, and was last modified February 27, 2012. The CVCB loan matured on February 5, 2015 and was not renewed. On February 17, 2015, CVCB recorded a notice of default with the Tehama County Recorder's Office. By order entered June 24, 2015 (Doc #109) denying CVCB's motion seeking relief from the automatic stay to foreclose on the CVCB Collateral, the Court agreed with Debtor that CVCB enjoys a significant equity cushion and is adequately protected as that term is defined in the Bankruptcy Code (11 U.S.C. §361). All real property taxes assessed against the CVCB collateral (the "CVCB Collateral") are current and paid through June 30, 2015 and the CVCB Collateral is currently listed for sale by Properties by Merit, Inc. Interested parties may view the sale listing for the CVCB Collateral at: http://www.realtor.com/realestateandhomes-detail/20480-Lake-California-Dr_Cottonwood_CA_96022_M17361-38991?row=2

(2) Redding Bank of Commerce ("RBC"). RBC has asserted two secured claims against Debtor: Claim #7, in the amount of $1,835,627, and Claim #8, in the amount of $1,360,715 were both filed June 25, 2015. It is Debtor's position that Claim #7 is primarily secured by three parcels (hereinafter sometimes referred to as the "Initial Collateral") with a combined *assessed* value (by the Tehama County Tax Assessor) of $1,456,134, and that pursuant to a "Loan Restructure & Workout Agreement" dated August 16, 2013 (the "LRWA") Debtor pledged additional collateral of a value not to exceed $2.6m to secure Claim #7, consisting of 2600 acres of undeveloped ranch property (which excludes the Sunset Hills Subdivision). The 2,600 acres (hereinafter referred sometimes as the "Additional Collateral") is scheduled in Debtor's Schedule A (Real Property) at its *assessed* value of $1,981,332. By way of background, as of the August 2013 Restructure date RBC was owed approximately $5.4m by Debtor, but received $3.958m in net sale proceeds from Debtor's sale of 468 acres on September 4, 2014, a portion of which – approximately $350k - was used by Shasta Enterprises Chapter 11 Trustee, Hank Spacone, to complete tenant improvements on property owned by his estate.

Debtor disputes Claim #8 insofar and to the extent it asserts that the Additional Collateral pledged under the LRWA secures the projected $1,360,715 in deficiencies summarized by RBC in its Claim #8, although it does agree that RBC has no obligation under the LRWA to release the lien against the Additional Collateral prior to the sale of 250 Hemsted, so long as there is no deficiency owing to RBC on account of the loan secured by that property. To the extent any disagreement over the interpretation of the LRWA as it affects the Additional Collateral cannot be resolved consensually Debtor intends to file a complaint for declaratory and injunctive relief with the Bankruptcy Court to settle the dispute.

RBC recorded with the Tehama County Recorder a Notice of Default on October 24, 2014 as to Claim #7 only, and subsequently filed a Notice of Sale dated February 4, 2015, scheduling a trustee's sale date of March 4, 2015. Debtor believes that RBC enjoys a significant equity cushion and is adequately protected. All real property taxes assessed against the RBC

collateral (collectively the "RBC Collateral") are current and paid through June 30, 2015 and the RBC Collateral is currently listed for sale by Properties by Merit, Inc.

(3) Joe & Lavonne Curto Family Trust ("Curto"). Curto's proof of claim #4, filed June 4, 2015, indicates $605,426.20 owing as of the Petition Date, secured by a first position deed of trust against Debtor's fee simple interest in a residence located at 75085 Inverness Drive in Indian Wells, California (the "Curto Collateral") scheduled by Debtor at an *assessed* value of $846,000. Debtor believes that Curto enjoys a significant equity cushion and is adequately protected. All homeowner association ("HOA") dues assessed against the Curto Collateral are current, and all real property taxes assessed against the Curto Collateral are current and paid through June 30, 2015. The Curto Collateral is currently listed for sale by Keller Williams Realty.

Debtor also owes Antonio Rodriguez III ("Rod 3") $125,000. This obligation is unsecured. This is the primary unsecured debt owed by the Debtor.

B. Current Status of Debtor's Business Operations and Assets

Debtor continues to manage the Real Estate and is actively marketing the Real Estate. All income generated from post-petition sales (escrows have closed on several Sunset Hills Subdivision lot sales since the Petition Date) have been deposited into Debtor's Chapter 11 Debtor-in-Possession Account and accounted for in Debtor's timely filed monthly operating reports.

C. Post-Petition Management of the Debtor's Affairs

Just prior to the Petition Date, Rod Jr. relinquished management and control over Debtor to Rod 3 who continues to manage and operate all Property of the Estate, and intends to continue doing after the Plan has been confirmed. Rod 3 will continue to receive a minimum discounted monthly salary of $1,000/month plus health insurance benefits in exchange for services rendered pending confirmation of the Plan, and $5,000 per month thereafter to effectuate the confirmed Plan of Reorganization after the Debtor has successfully emerged from bankruptcy.

**Article V**
**Events Precipitating the Chapter 11 Filing**

On October 31, 2015, Shasta Enterprises ("Shasta") filed a voluntary Chapter 11 petition in bankruptcy, posing an indefinite delay to the repayment of its sizeable ($4.2m) debt to Debtor (described in greater detail in Article VI, below). By December 24, 2014 a Chapter 11 Trustee had been appointed to dispossess Shasta's management, then led by Rod Jr., which resulted in an additional layer of expense for Shasta's administration and a worsening prospect of repayment of the receivable.

Notwithstanding that its loan had been paid down in good faith by Debtor from @$5.4m to approximately $1.8m, and having negotiated additional collateral to secure that remaining balance valued in combination with the original collateral at over $3.4m, RBC refused to further

restructure the debt and scheduled a foreclosure sale for March 4th for the collateral which originally was pledged as security (that is, excluding the Additional Collateral as described in Article IV, above).

Meanwhile, Debtor's loan with CVCB, which was otherwise then current, matured on February 5, 2015 and was not renewed, and a notice of default was filed by CVCB on February 17, 2015. Finally, Debtor's short term loan with Curto had matured April 1, 2013 and was not renewed, resulting in a notice of default recorded February 20, 2015.

While all of these events were germane to Debtor's decision to file for bankruptcy protection, the timing of the bankruptcy filing (February 27, 2015) was most heavily influenced by RBC's March 4, 2015 foreclosure sale date and RBC's refusal to negotiate a further forbearance of the RBC Loan.

## Article VI
## Past, Pending and Contemplated Litigation

There is no pending litigation which involves the Debtor beyond the foreclosure proceedings referenced in the immediately preceding paragraph.

As for contemplated litigation, the deadline for general creditors to file claims expired June 25, 2015, but August 26, 2015 is the deadline for governmental entities to file proofs of claims. Because this Disclosure Statement pre-dates the governmental Bar Dates, Debtor cannot identify all claims which may ultimately be filed and/or objected to or the basis for such objections. That notwithstanding, Debtor is aware of following potential disputes which will need resolved through litigation if they cannot be settled consensually:

First, the IRS filed on March 17, 2015 (Claim #1) what appears to be a precautionary $100 "priority" proof of claim which Debtor contests and will object to it is not withdrawn.

Second is the $180,492 contingent claim (the "Contingent Claim") filed June 25, 2015 by Hank Spacone in his capacity as the Trustee for Shasta Enterprises, which Debtor understands was filed by Trustee Spacone in an abundance of caution to prevent the inadvertent discharge of any claim he may assert on account of "avoidable" pre-petition transfers as summarized in the Claim. Debtor also appreciates that in order to prosecute such Contingent Claim, Trustee Spacone will be obliged to file an adversary complaint which Debtor would aggressively defend against. Even if Trustee Spacone ultimately elects to pursue the Contingent Claim, and Debtor's defenses fail, and the Contingent Claim is ultimately recognized and allowed as an unsecured claim, Debtor will have a correspondingly larger claim against the Shasta Enterprises bankruptcy estate. Debtor has an undisputed, noncontingent, liquidated scheduled $2,857,267 claim in the Shasta Enterprises bankruptcy which was increased by approximately $350,000 in funds loaned post-bankruptcy to the Trustee (see "Order on Motion for Authority to Assume Executory Contract and for Post-Petition Borrowing" filed January 7, 2015 in Case #2014-30833 as Doc#176), subject to a credit for any refund actually received by Debtor pursuant to the terms of the Order. In addition, on June 26, 2015, Debtor concluded an audit of its claim against Shasta Enterprises and determined the claim scheduled by Shasta Enterprises did not include over $1m

of accrued but unpaid interest, resulting in a revised claim as of 10/31/2014 of $4,213,869.65 ($3,207,267.13 + $1,006,602.52 = $4,213,869.65 ), including the Court approved $350k advanced post-petition by BR. Finally, Debtor's claim will increase proportionate to any moneys reclaimed by the Trustee in connection with the Contingent Claim. Due to the foregoing, and pending the outcome of these contingent eventualities, the Contingent Claim will be acknowledged and treated by Debtor in the Plan as a contingent claim, but treated for all purposes and intents as disputed by the Debtor.

Third, as described in more detail at Article IV, above, Debtor did amend its Schedules on June 11, 2015 to clarify its interpretation of the LRWA following a more careful analysis of the LRWA, and intends to file and prosecute an adversary proceeding seeking declaratory and injunctive relief against RBC to resolve any competing legal positions in the event there is no consensual resolution.

Fourth, CVCB asserts in its proof of claim filed June 17, 2015 (Claim #5) to be owed $1,808,222 as of the Petition Date, consisting of $1,772,366.73 in principal, $20,678.11 in pre-petition interest, $5,948.19 in late charges, $4,000 in appraisal fees, and $5,229.54 in foreclosure fees and costs. Debtor intends to challenge all charges except for the principal and non-default interest.

Fifth, Debtor intends to challenge at least the interest component of Curto's Claim, which appears to have calculated at a slightly higher rate than called for under the governing loan documents.

Debtor has not had a sufficient opportunity to carefully review all claims submitted to date, and reserves all rights to challenge any claim asserted against the Debtor for any reason and at any time.

Debtor projects (see Article VII, below) that there is sufficient equity to pay all Allowed Claims in full in these proceedings and therefore sees no value in researching or filing lawsuits to recover theoretically avoidable transfers such as "preferences" (11 U.S.C. §547) or so-called "fraudulent transfers" (11 U.S.C. §§544, 548, 550) designed to increase a *pro-rata* distribution to creditors. Nonetheless, Debtor has preserved the right to prosecute any and all claims, including avoidable transfers, at Article XI, paragraph 11.03 of the Plan, in the event it decides it would be in the best interests of creditors to pursue such claim(s).

## Article VII
## Cash Flow Projections

The Plan allows the Debtor up to five (5) years to generate the monies required to fund this Plan. Projected income and expenses for the duration of the Plan Term are set forth in the "Operating Budget" attached to this Disclosure Statement as **Exhibit "A"** for demonstrative purposes only. The Operating Budget conservatively assumes the following: (a) A Confirmation Date of October 1, 2015, (b) an Effective Date of November 1, 2015; (c) "adequate protection payments" consisting of the timely payment of accruing real property taxes as they come due, and monthly payments of interest-only on all Allowed Secured Claims amortized over

thirty years at 5.25% per annum from the Petition Date pending the sale of each such creditor's collateral, with a deadline of twenty four months from the Petition Date to pay those creditors in full by way of sale or refinance; (d) timely payment of all operating expenses, including applicable HOA and real estate related fees, including real property taxes, payroll, and office overhead expenses during the Plan Term; (e) no sales or income during the Plan Term from cattle sales or real property rentals; (f) no dividend will be paid on account of the Shasta Enterprises receivable until the very end of the Plan Term, after all creditors have been paid in full; and (g) a minimum of $300,000 in annual net income will be generated from the sale of Sunset Hills Subdivision Lots.

The Operating Budget reflects Debtor's "best guess" as to how much the Debtor will generate during the Plan Term based on historical performance and additional assumptions as to future performance as more specifically described in Article X (Plan Assumptions) below. The exact timing and order of sales may change from what is shown in the Operating Budget.

Nothing in the Plan shall be construed to prevent the Debtor from borrowing whatever funds are required to perform under the Plan. Debtor shall retain sole discretion to liquidate Property of the Estate as necessary to perform during the Plan Term.

## Article VIII
## Classification of Claims and Interests

For the purposes of classifying the Debtor's obligations created under the Plan, the claims and interest of the creditors of the Debtor are classified as follows:

8.00 Unclassified Claims: The following Unclassified Claims shall be treated, but shall not necessarily be entitled to vote under this Plan:

- Professional Fees & Costs allowed per Bankruptcy Code §507(a)(2):
  - Hollister Law Corporation (Debtor's Authorized Bankruptcy Counsel)
    - Estimated at $75,000
  - Evanhoe Kellogg & Co (Debtor's Authorized Certified Public Account)
    - Estimated at $5,000
  - Properties by Merit, Inc. & Keller Williams Realty (Debtor's Authorized Brokers/Realtors)
    - Estimated at $0 (Paid current as each escrow closes)
- Deposits allowed per Bankruptcy Code §507(a)(7) [maximum of $2,775]
  - None
- Unsecured Priority Tax Claims of Government Units allowed by Bankruptcy Code §507(a)(8)

- Internal Revenue Service ($100 – Claim #1 – Disputed)

8.01 Class 1: (Redding Bank of Commerce) Class 1 is comprised of the secured claims of Redding Bank of Commerce. This Class 1 Creditor is impaired.

8.02 Class 2: (Central Valley Community Bank) Class 2 is comprised of the secured claim of Central Valley Community Bank. This Class 2 Creditor is impaired.

8.03 Class 3: (Joe & Lavonne Curto Family Trust). Class 3 is comprised of the secured claim of the Joe & Lavonne Curto Family Trust. This Class 3 Claimant is impaired.

8.04 Class 4: (Tehama County Tax Collector) Class 4 is comprised of the Allowed Secured Claims of the Tehama County Tax Collector on account of real property taxes assessed against the Real Estate. This Class 4 Claimant is *not* impaired.

8.05 Class 5: (Contingent Unsecured Claims) Class 5 consists of the disputed contingent unsecured claim of Hank Spacone, Trustee of Shasta Enterprises, a California Partnership. This Class is not impaired.

8.06 Class 6: (General Unsecured Claims) Class 6 consists of all Allowed Unsecured Claims not treated in any other Class, including any deficiency claims of holders of Allowed Secured Claims. This Class is impaired.

8.07 Class 7: (Equity) Class 7 consists of all interests of Debtor's General Partners, Antonio Rodriguez Jr. and Antonio Rodriguez III in the Debtor. This Class is unimpaired.

## Article IX
## Impairment of Claims

9.01 All classes of claims, other than Classes 4, 5 and 7 are impaired as that term is defined at 11 U.S.C. § 1124.

## Article X
## Plan Assumptions

The Plan is predicated upon the following assumptions, in addition to the assumptions underlying the Operating Budget referenced at Article VII of the Disclosure Statement:

10.01 Debtor will pay all post-bankruptcy obligations and operating expenses as they come due, including all taxes including but not limited to real estate taxes and payroll taxes, HOA dues, employee wages, administrative overhead, and other payments to creditors required during the Plan Term from ongoing lease and/or sales of Real Estate;

10.02 Debtor will continue to market and sell (or endeavor to refinance) so much of the Real Estate as is necessary to fund the Plan during the Plan Term.

10.03 All Allowed Claims of creditors will be paid in full within five years of the Effective Date either through the sale or refinancing of the real and/or personal property of the estate, with the exception that all Allowed Secured Claims (Classes 1 through 3) shall be paid in full within two years of the Effective Date, with amortized monthly interest-only payments to be made in the interim commencing on the Effective Date as provided in the Plan.

10.04 Debtor will generate a minimum of $300,000 net of closing costs and liens annually during the Plan Term from the sale of Sunset Hills Subdivision Lots.

10.05 Tax Assumptions: The Bankruptcy Code requires a discussion of the "potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. §1125(a)(1). Debtor is a general partnership organized and maintained under the laws of the State of California, and therefore Debtor assumes that all profits and losses realized during the Plan Term will be passed through to its partners the same as they did prior to the Petition Date. Consequently, Debtor does not expect to be directly impacted by taxable events triggered by the liquidation of assets under the Plan. Notwithstanding the foregoing, Creditors are encouraged to consult with a qualified tax professional and should not rely upon any statements by the Debtor (not a tax expert) regarding possible tax consequences either to the Debtor or to Creditors under this Plan. Any distribution made pursuant to the terms of any confirmed plan would be net of (i.e., after payment in full of) any tax imposed upon the bankruptcy Estate or its partners. Consequently, any distribution to creditors under the confirmed plan may be considered taxable income to such creditors by taxing authorities, and may have to be disclosed as such when required by applicable law to entitled taxing authorities by the beneficiary of any plan payment. More specific tax assumptions are contained in the Liquidation Analysis at Article XIV, below.

## Article XI
## Summary of Plan

Creditors are strongly encouraged to carefully review the terms of treatment set forth in the accompanying Plan with independent bankruptcy counsel. A summary version of the proposed plan treatment, which summary does not necessarily include all significant plan provisions, follows:

**Treatment of Unclassified Claims:**

11.01. Unless the holder of a particular Claim agrees otherwise, all Allowed Administrative Claims, and U.S. Trustee Fees (payable through the Confirmation Date under 28 U.S.C. §1930) shall be paid by the Debtor in full, in cash, by no later than the Effective Date or, if not allowed until after the Effective Date, within fifteen (15) calendar days following the entry of a Court order approving such payment. *Claims for pre-confirmation Administrative Claims*

*not previously allowed by the Court, must be filed with the Court and served on counsel for the Debtor by the 60th calendar day following the Effective Date shall be conclusively deemed waived and forfeited.*

Actual pre-confirmation Administrative Claims are regularly disclosed in Debtor's monthly operating reports as they accrue, and are paid in the ordinary course of business with the exception of professional fees which may only be paid following approval of the Court. As of the May 2015 monthly operating report, for example, a total of $31,899 in professional fees were reported, all incurred by Debtor's bankruptcy counsel (Hollister Law Corporation or ("HLC")). Debtor has also retained a CPA to prepare its tax returns and Schedule K-1 Forms for the partners, has hired brokers to assist in the marketing and sale of the Real Estate, all of whom, like Debtor's attorneys, may not be paid except pursuant to Court order. HLC holds a retainer in excess of $96k, and Debtor's projections predict there will be enough funds to pay all administrative claims in full on the Effective Date.

11.02. Allowed Priority Tax Claims: Holders of any Allowed Priority Tax Claims arising under §507(a)(8) will receive payment in full by no later than five (5) years after the Petition Date by way of deferred cash payments. The balance owed on said claims shall be paid, at the latest, in equal quarterly installments of principal and interest, with the first payment being due on the 15th day of the first full calendar quarter following the Effective Date. Debtor may pre-pay these tax claims, if any there be.

As discussed in Article VI, above, the IRS filed what appears to be a precautionary $100 "priority" proof of claim which Debtor contests and will object to it is not withdrawn. Nonetheless, should the IRS Priority Tax Claim be allowed, it would be paid pursuant to this paragraph. To the best of Debtor's knowledge, there are no other known priority claims scheduled, filed or owed by Debtor.

**Treatment of Impaired Classes**

11.03. Impaired Classes Generally. All Classes other than Classes 4 (Tehama County Tax Collector), 5 (Contingent Claim of Shasta Enterprise Trustee Hank Spacone) and 7 (Equity) are impaired under the Plan. In no event will the holder of any Allowed Claim receive distributions of a value equal to more than one hundred percent (100%) of the amount of such Allowed Claim, inclusive of interest thereon as may be provided in the Plan. All impaired classes of claims and classes of interest shall receive the distributions set forth in this Article on account of and in complete satisfaction of all such Allowed Claims (and any interest accrued thereon). Without limiting the foregoing and effective upon the Effective Date, each creditor and each equity security holder (or their successors) shall be deemed to have assigned to the Debtor and all such parties shall be deemed to have waived, relinquished and released any and all of their rights and claims against the Debtor, other than as provided for in the Plan or the Court's order confirming the Plan.

11.04. **Class 1 Allowed Secured Claim of Redding Bank of Commerce:**

Class 1 is comprised of the Allowed Secured Claims of Redding Bank of Commerce ("RBC" or "Class 1 Claimant"). RBC has asserted two secured claims against Debtor: Claim #7, in the amount of $1,835,627, and Claim #8, in the amount of $1,360,715 were both filed June 25, 2015. Claim #7 is undisputed and Claim #8 is disputed. According to Debtor's books and records, RBC's Allowed Secured Claim was approximately $1.835m as of the Petition Date. The underlying loan documents (collectively the "RBC Loan") call for a non-default rate of interest at 3.75% over the weekly average yield on a five year U.S. treasury note which was 1.5%[2] as of the Petition Date for a 5.25% rate. The RBC Loan, which had a loan balance of $5.46m when originated on September 9, 2009, has matured by its terms and has not been renewed and is currently in default.

The RBC Loan is secured by deeds of trust against three parcels of Debtor's Real Estate with a combined *assessed* value of $1,456,134, described in Debtor's Schedule A (Real Property) filed March 11, 2015 (Doc #22) (hereinafter "Debtor's Schedule 'A'") as follows (hereinafter the "Initial Collateral"):

**Parcel 004-140-73 (33.32 Acres NW of Main House along HWY I-5) ($61,425 Tax Assessor's Value)**
**Parcel 004-140-75 (8 Acres NW of Main House along HWY I-5) ($5,313 Tax Assessor's Value)**
**Parcel 004-140-86 (237.72 Acres Due South of Main House along HWY I-5, improved by barns, guest house and various out buildings) ($1,389,396 Tax Assessor's Value)**

The RBC Loan is also secured by another 2600 acres +/- of unimproved ranch land owned by Debtor and pledged as additional secured in an amount not to exceed $2.6m in connection with a "Loan Restructure & Workout Agreement" dated August 16, 2013 (the "LRWA"). This 2600 acres (hereinafter the "Additional RBC Collateral") is described in Debtor's Amended Schedule "A" as follows:

| | | | | |
|---|---|---|---|---|
| 2600 Acres of undeveloped ranch property located in Cottonwood, California in Tehama County, located due South of the Main House consisting of the following ten contingous parcels pledged to Redding Bank of Commerce ("RBC") as additional collateral for the $1.8m "Ranch Loan" and also as collateral for loans made by RBC to JSR Enterprises and Shasta Enterprises:<br><br>Parcel 004-140-78 (200.71 Acres) $368,028 Tax Assessed Value<br>Parcel 004-140-83 (267.26 Acres) $177,886 Tax Assessed Value<br>Parcel 006-200-30 (457.14 Acres) $304,271 Tax Assessed Value<br>Parcel 006-200-33 (157.58 Acres) $104,883 Tax Assessed Value<br>Parcel 007-070-07 (312 Acres) $212,544 Tax Assessed Value<br>Parcel 007-070-09 (48 Acres) $31,950 Tax Assessed Value<br>Parcel 007-070-24 (174.45 Acres) $115,960 Tax Assessed Value<br>Parcel 009-150-12 (416.73 Acres) $277,187 Tax Assessed Value<br>Parcel 009-150-13 (308.87 Acres) $205,767 Tax Assessed Value<br>Parcel 009-490-06 (274.59 Acres) $182,856 Tax Assessed Value<br><br>All values are Tax Assessed Value. Fair market value shall be determined upon close of escrow or by a Court of competent jurisdiction. The lien against these Parcels in favor of RBC may not exceed $2,600,000. | Fee Simple | | 1,981,332.00 | 1,834,437.41 |

[2] See, http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2015

This Class 1 Claimant is impaired.

Class 1 Claimant shall have an Allowed Secured Claim as of the Petition Date of $1,835,627.61, consisting of $1,802,437 in principal, $21,487.78 in interest, $2,000 in late charges, and $9,702.83 in late charges or, alternatively, in such different amount ordered by a Court of competent jurisdiction or agreed to by Debtor and Class 1 Claimant in writing. From the Petition Date through the Confirmation Date, the principal portion of the Allowed Class 1 Secured Claim shall accrue interest at the simple rate of 5.25%, which from 2/28/15 - 9/30/15, for example, would equal @$56,514 in post-petition/pre-confirmation interest. As of the Confirmation Date, all then-outstanding principal, pre-petition interest, post-petition interest, and reasonable attorneys fees allowed pursuant to Article IX, Paragraph 9.01 of the Plan (estimated in the Disclosure Statement at $15,000 net of offsets) shall be consolidated, and the resulting consolidated balance (hereinafter referenced as the "Allowed Class 1 Claim") shall be amortized over thirty years and accrue interest at the fixed simple rate of 5.25% per annum until paid in full. Interest-only payments (estimated in the projections attached to the Disclosure Statement at @$8,658/month) shall be paid to Class 1 Claimant on the first day of the full month following the Confirmation Date, and on the first day of each month thereafter until paid in full.

The Allowed Class 1 Claim shall mature and be due and payable in full on the first full day of the twenty fourth (24th) month following the Effective Date from the net proceeds generated from either the sale or refinancing of all or a portion of its real property collateral as described herein (the "RBC Collateral").

Pending the payment in full of Allowed Class 1 Claim, Class 1 Claimant shall retain all existing liens against the RBC Collateral in the order and priority such lien(s) existed as of the Petition Date. In addition to the foregoing, Debtor shall take all necessary and reasonable steps required to maintain and preserve the RBC Collateral and Debtor shall make the following adequate protection payments to or for the benefit of Class 1 Claimant: (1) timely payment of all real property taxes assessed against the RBC Collateral as such taxes are due and payable, and (2) monthly interest payments as provided for above.

Upon payment in full of the Allowed Class 1 Claim, Class 1 Claimant shall irrevocably release – and shall be deemed automatically and for all purposes to have irrevocably released - any and all right, title, interest in and claims and/or liens it has or may have (known or unknown) against the Initial Collateral. Notwithstanding the foregoing, Class 1 Claimant shall be under no obligation to release its lien against the Additional RBC Collateral unless and until such time that (1) the Allowed Class 1 Claim is paid in full, and (2) Loan #4175328 secured by property owned by Shasta Enterprises located at 250 Hemsted Drive in Redding, California (APN #107-530-017) has been paid in full (collectively, the "Condition Precedent"). Immediately upon the satisfaction of the Condition Precedent, Class 1 Claimant shall irrevocably release – and shall be deemed automatically and for all purposes to have irrevocably released - any and all right, title, interest in and all claims and/or liens it may have (known or unknown) against the Debtor and against the Additional Collateral.

Notwithstanding the foregoing, if a Court of competent jurisdiction determines by Final Order that Class 1 Claimant's rights to the Additional Collateral are different that as provided herein, then Class 1 Claimant shall release its liens and claims against the Additional Collateral only upon satisfaction of the terms and conditions contained in such Final Order, or as mutually agreed with the Debtor in writing.

11.05. Class 2: **(Allowed Secured Claim of Central Valley Community Bank)**

Class 2 consists of the allowed claim of Central Valley Community Bank ("CVCB" or "Class 2 Claimant"). CVCB asserts in its proof of claim filed June 17, 2015 (Claim #5) to be owed $1,808,222 as of the Petition Date, consisting of $1,772,366.73 in principal, $20,678.11 in pre-petition interest, $5,948.19 in late charges, $4,000 in appraisal fees, and $5,229.54 in foreclosure fees and costs. Debtor intends to challenge all charges except for the principal and non-default interest. If such challenge is successful, Debtor calculates CVCB shall have an allowed claim of @$1,786,598. The Class 2 Claim is secured by a first position deed of trust against the so-called "Main House" which sits on approximately 14 acres on the Ranch (APN 004-140-72), and which is valued in Debtor's schedules at $3.8m, which is the value *assessed* by the Tehama County Tax Assessor and does not necessarily reflect *fair market* value. The loan to CVCB, originated May 2, 2008 in the amount of $2.3m, and was modified February 27, 2012. The CVCB loan as modified calls for 5.25% simple interest rate, matured on February 5, 2015, and was not renewed. This Class 2 Creditor is impaired.

Class 2 Claimant shall have an Allowed Secured Claim as of the Petition Date of $1,786,598, consisting of $1,772,895 in principal and $13,703 in interest (@ 5.25% from 1/16/14 - 2/27/15 = $13,703) or, alternatively, in such different amount ordered by a Court of competent jurisdiction or agreed to by Debtor and Class 2 Claimant in writing. From the Petition Date through the Confirmation Date, the principal portion of the Allowed Class 2 Secured Claim shall accrue interest at the simple rate of 5.25%, which from 2/28/15 - 9/30/15, for example, would equal $55,588 in post-petition/pre-confirmation interest. As of the Confirmation Date, all then-outstanding principal, pre-petition interest, post-petition interest, and reasonable attorneys fees allowed pursuant to Article IX, Paragraph 9.01 of the Plan (estimated in the Disclosure Statement at $2,500 net of offsets) shall be consolidated, and the resulting consolidated balance (hereinafter referenced as the "Allowed Class 2 Claim") shall be amortized over thirty years and accrue interest at the fixed simple rate of 5.25% per annum until paid in full. Interest-only payments (estimated in the projections attached to Disclosure Statement at @$8,340/month) shall be paid to Class 2 Claimant on the first day of the full month following the Confirmation Date, and on the first day of each month thereafter until paid in full.

The Allowed Class 2 Claim shall mature and be due and payable in full on the first full day of the twenty fourth (24th) month following the Effective Date from the net proceeds generated from either the sale or refinancing of all or a portion of its real property collateral as described herein (the "CVCB Collateral").

Pending the payment in full of Allowed Class 2 Claim, Class 2 Claimant shall retain all existing liens against the CVCB Collateral in the order and priority such lien(s) existed

as of the Petition Date. In addition to the foregoing, Debtor shall take all necessary and reasonable steps required to maintain and preserve the CVCB Collateral and Debtor shall make the following adequate protection payments to or for the benefit of Class 2 Claimant: (1) timely payment of all real property taxes assessed against the CVCB Collateral as such taxes are due and payable, and (2) monthly interest payments as provided for above.

Upon payment in full of the Allowed Class 2 Claim, Class 2 Claimant shall irrevocably release – and shall be deemed automatically and for all purposes to have irrevocably released - any and all right, title, interest in and claims and/or liens it has or may have (known or unknown) against the CVCB Collateral.

11.06. Class 3: **(Allowed Secured Claim of Joe & Lavone Curto Family Trust)**

Class 3 consists of Joe & Lavone Curto Family Trust ("Curto" or "Class 3 Claimant"). According to a Notice of Default filed on February 20, 2015 with the Riverside County Recorder, Curto was owed $603,395 as of February 12, 2015. Curto's proof of claim #4, filed June 4, 2015, indicates $605,426.20 secured by a first position deed of trust against Debtor's fee simple interest in a residence located at 75085 Inverness Drive in Indian Wells, California (APN #633-720-015-5), which collateral (the "Curto Collateral") was scheduled at an *assessed* value of $846,000 (which does not necessarily reflect *fair market* value). The loan with Curto, which calls for an interest rate of the Bank of America Reference Rate (currently 3.25%)[3] plus 2% (i.e. 5.25% currently) with a minimum rate of 5% and a maximum rate of exceed 8%, matured April 1, 2013 and was not renewed, resulting in a notice of default recorded February 20, 2015. This Class 3 Claimant is impaired.

Class 3 Claimant shall have an Allowed Secured Claim as of the Petition Date of $600,542, consisting of $558,651 in principal and $41,891 in interest (@ 7% from 2/1/14 - 2/27/15 = $41,891) or, alternatively, in such different amount ordered by a Court of competent jurisdiction or agreed to by Debtor and Class 3 Claimant in writing. From the Petition Date through the Confirmation Date, the principal portion of the Allowed Class 3 Secured Claim shall accrue interest at the simple rate of 5.25%, which from 2/28/15 - 9/30/15, for example, would equal $17,276 in post-petition/pre-confirmation interest. As of the Confirmation Date, all then-outstanding principal, pre-petition interest, post-petition interest, and reasonable attorneys fees allowed pursuant to Article IX, Paragraph 9.01 of the Plan (estimated in the Disclosure Statement at $2,500) shall be consolidated, and the resulting consolidated balance (hereinafter referenced as the "Allowed Class 3 Claim") shall be amortized over thirty years and accrue interest at the fixed simple rate of 5.25% per annum until paid in full. Interest-only payments (estimated in the projections attached to Disclosure Statement at @$2,766/month) shall be paid to Class 3 Claimant on the first day of the full month following the Confirmation Date, and on the first day of each month thereafter until paid in full.

---

3 This is Bank of America's current prime rate. See, http://newsroom.bankofamerica.com/press-kit/prime-rate-information. Debtor is unable to locate data referencing a "reference rate."

The Allowed Class 3 Claim shall mature and be due and payable in full on the first full day of the twenty fourth (24th) month following the Effective Date from the net proceeds generated from either the sale or refinancing of all or a portion of the "Curto Collateral."

Pending the payment in full of Allowed Class 3 Claim, Class 3 Claimant shall retain all existing liens against the Curto Collateral in the order and priority such lien(s) existed as of the Petition Date. In addition to the foregoing, Debtor shall take all necessary and reasonable steps required to maintain and preserve the Curto Collateral and make the following adequate protection payments to or for the benefit of Class 3 Claimant: (1) timely payment of all real property taxes assessed against the Curto Collateral as such taxes are due and payable, (2) all homeowner association fees, and (3) monthly interest payments as provided for above.

Upon payment in full of the Allowed Class 3 Claim, Class 3 Claimant shall irrevocably release – and shall be deemed automatically and for all purposes to have irrevocably released - any and all right, title, interest in and claims and/or liens it has or may have (known or unknown) against the Curto Collateral.

11.07. Class 4: **(Allowed Secured Claims of Tehama County Tax Collector)**

Class 4 is comprised of the Allowed Secured Claims, if any, of the Tehama County Tax Collector ("TCTC" or "Class 4 Claimant") on account of real property taxes assessed against the Real Estate. According to Debtor's records, all real property taxes were paid current through June 30, 2015 as of the Petition Date. Class 4 Claimant shall retain all statutory lien rights arising under applicable nonbankruptcy law, and Debtor shall continue to pay timely all real property taxes and assessments in the ordinary course of business as such taxes become due and payable. This Class 4 Claimant is *not* impaired.

11.08. Class 5: **(Contingent Unsecured Claim of Hank Spacone, Chapter 11 Trustee of Shasta Enterprises, a California partnership)**

Class 5 consists of the disputed contingent claim (the "Class 5 Claim") filed June 25, 2015, by Hank Spacone in his capacity of Chapter 11 Trustee of Shasta Enterprises, a California partnership ("Class 5 Claimant"), as such claim may be amended from time to time. This Claim is unimpaired.

The Class 5 Claim shall be deemed an Allowed Unsecured Claim in such amount (the "Class 5 Allowed Unsecured Claim") and at such time, if ever, that Class 5 Claimant both (1) timely files an adversary complaint within the time period prescribed by 11 U.S.C. §546(a), and (2) obtains a final judgment against Debtor. So long as he has then timely filed the adversary proceeding referenced above, and except as other ordered by the Bankruptcy Court, Class 5 Claimant shall withhold from any dividend then payable to Debtor by the Shasta Enterprises estate, and sequester in an interest bearing, federally insured, blocked account in trust for Debtor (the "Blocked Account"), an amount equivalent to one hundred and ten percent

(110%) of the maximum claim asserted by Class 5 Claimant in good faith against Debtor in such adversary proceeding, pending a final judgment. Class 5 Claimant shall also withhold and sequester in the Blocked Account an additional amount equal to Debtor's projected increased *pro-rata* share of any distribution resulting from Debtor's hypothetical payment of the Class 5 Allowed Unsecured Claim to Class 5 Claimant in the event of a hypothetical adverse judgment equal to the funds sequestered in the Blocked Account. The balance of any dividend available for distribution to Debtor net of the funds in the Blocked Account shall be immediately paid by Class 5 Claimant to Debtor, all rights reserved by all parties. Any difference between the balance in the Blocked Account and the Class 5 Allowed Unsecured Claim shall be immediately distributed to Debtor on account of Debtor's claim against Shasta Enterprises, which consists of its originally scheduled claim of $2,857,267, plus approximately $350,000 loaned to Shasta Enterprises post-petition (see "Order on Motion for Authority to Assume Executory Contract and for Post-Petition Borrowing" filed January 7, 2015 in Case #2014-30833 as Doc#176, less any refund actually received by Debtor pursuant to the terms of the Order, plus any claim arising from any payment of any final judgment rendered in any adversary proceeding successfully prosecuted by Trustee Spacone against Debtor. In the event there is a deficiency owing to Class 5 Claimant by Debtor in excess of the funds in the Blocked Account, such deficiency shall be treated and paid as a Class 6 General Unsecured Claim.

11.09. <u>Class 6:</u> **(General Unsecured Claims)**

Class 6 consists of all Allowed Unsecured Claims not treated in any other Class, including any deficiency claims of holders of Allowed Secured Claims. This Class is impaired. Debtor estimates that Class 6 Unsecured Claims amount to approximately $126,000 as follows:

- Antonio Rodriguez III ($125,000 – Scheduled);
- Southern California Edison Company ($277.34 – Claim #2);
- VESTRA Resources, Inc. ($667.28 – Claim #3)

Class 6 Allowed Unsecured Claims shall be paid *pro rata* by the Debtor from available funds in the Creditors' Account on a semi-annual basis to the extent funds are available for such purpose as more specifically provided at Article VIII of the Plan. In no event shall Class 6 Creditors receive more or less than one hundred percent (100%) of their Allowed Claims under the terms of this Plan. Interest shall accrue on all Class 6 Allowed Unsecured Claims, beginning on the Effective Date, at the simple rate of seven percent per annum until paid in full.

Pro-rata distributions shall be made to or on account of Class 6 Allowed Unsecured Claims as soon as practicable, but in no event prior to such time that all Administrative Claims and Unclassified Claims referenced at Article II of the Plan have been liquidated and paid in full, and so long as at the time of such distribution(s), Debtor has a sufficient reserve of Net Income to fund its business operations and to timely make all other payments required under the Plan.

11.10. <u>Class 7</u>: **(Equity)** Class 7 consists of all interests of Debtor's General Partners, Antonio Rodriguez Jr. and Managing Partner Antonio Rodriguez III (the "Class 7

Members") in the Debtor. The Class 7 Members are unimpaired and shall retain all interests in Debtor notwithstanding confirmation of this Plan and/or Debtor's discharge, but shall receive no distribution on their respective capital accounts except after full payment of all Allowed Unsecured Claims. At the expiration of the Plan Term or, if earlier, the entry of Debtor's Discharge, any and all right, title, interests and/or claims of Creditors in (1) Debtor's Real Estate , (2) the Creditor Account, (3) property of the estate (revested or otherwise), and (4) any and all other real or personal property assets of the Debtor, including income from any source, existing as of the end of the Plan Term, whether or not held for the benefit of creditors, shall terminate and/or revert to Debtor, free and clear of such claims and/or interests (excluding only consensual deeds of trust). Debtor reserves all rights and claims against the Class 7 Members, including but not limited to rights and claims, whether legal or equitable, including claims for contribution and indemnity.

11.11. Pursuant to paragraph Article VIII of the Plan, above, the Plan shall be funded by Debtor through the liquidation or refinancing of Debtor's Real Estate as necessary to make the payments called for under the Plan. Pursuant to paragraph 8.02 of the Plan, Debtor shall make payments to Creditors by way of interest bearing, federally insured depository account(s) (the "Creditors' Account"), which shall be funded, managed and controlled by Debtor as described at Article VIII of the Plan.

11.12. Pursuant to Article VII of the Plan, in the event Debtor fails to perform any material obligation called for under the Plan with respect to a particular Claimant and/or Claim, and if Debtor fails to cure the default within twenty (20) calendar days of the receipt of a written notice of the default from such affected Claimant, that Claimant (and that Claimant alone) may immediately pursue such remedies as against the affected Claim(s) as are permitted with reference to applicable State and/or Federal law, subject only to any limiting terms set forth in the Plan, without further notice or Court order.

## Article XII
## Amendments to Legal Documents

As of the Effective Date of the Plan, and except as otherwise provided in the Plan, all contracts, promissory notes, security instruments, including trust deeds and security agreements referenced herein and in the Plan shall be deemed to be automatically modified, superseded, and/or extinguished to the extent necessary to conform to the terms of the confirmed plan treatment without further action by Debtor.

## Article XIII
## Effect on Confirmation of Plan

The effect of the Confirmation Order is detailed at Article XV of the Plan, beginning at paragraph 15.01. In summary, confirmation of the Plan, which shall occur on the Confirmation Date shall have all of the effects provided in such Section 1141 which are consistent with the terms of the Plan, except that the Debtor shall not receive or be eligible for a discharge of its debts until the earlier of (1) the last day of the Plan Term, or (2) the date Debtor has paid all Allowed Claims in full. Upon the Confirmation Date, Debtor may conduct its lawful business and financial affairs, including but not limited to the compromise of claims, the borrowing of

funds on either a secured or unsecured basis, and/or the liquidation of all or a portion of the Real Estate, personal property, and/or its business, without restrictions or further Court approval and, except as expressly provided in the Plan, the obligations to all creditors will be conclusively deemed current and cured retroactive to the occurrence of any default. Without limiting the foregoing, and consistent with 11 U.S.C. §1141(d)(1)(A), faithful, material performance under the Plan will discharge Debtor from all pre-petition debt.

**Article XIV**
**Liquidation Analysis**

Debtor submits that the Plan, if confirmed, will provide a better recovery to the creditors and interest holders than they would obtain if the Debtors' assets were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities.

Debtor projects that all creditors, but not necessarily equity security holders, would be paid in full over time even if this case were to be converted to Chapter 7 case and the assets liquidated other than in the ordinary course of business, unless unexpected costs of administration exceed the net proceeds of liquidation of unencumbered property, which is always a possibility, however remote in this case. Regardless, Debtor submits that compared to confirmation of the proposed plan, a liquidation proceeding would be unnecessarily chaotic and prejudicial to both unsecured creditors and equity security holders alike for the reasons which follow.

Debtor submits the proposed Plan as summarized in Article XI is preferable to a distressed sale liquidation because a Chapter 7 liquidation would *disrupt* the natural expectation potential bidders in a Chapter 11 case have of paying close to fair market value to acquire Estate assets, thereby resulting in lower overall liquidation prices. For example, in the event of the distressed sale liquidation in Chapter 7, potential bidders might rationally decide to wait either for a precipitous price drop or even a foreclosure sale before bidding for property of the estate in order to get a better deal – something they could not do under the subject Plan which allows a period of up to five (5) years to sell sufficient assets to pay all creditors in full. If those bidders are correct in their calculations, there would be little to no dividend available for unsecured creditors and interest holders from the distressed sale or resale following a foreclosure sale by an opportunistic lender.

In addition to the above-referenced skewed and disadvantageous market expectations not uncommon to forced liquidations and resulting "fire sales," a Chapter 7 would likely cost more on a percentage basis, if not overall. In part this because any Chapter 7 Trustee will necessarily be unfamiliar at first with what it takes to operate a nearly three thousand acre working ranch. Regardless of whether the cattle are sold, the Chapter 7 Trustee would be required to seek authorization to run the balance of the business, including handling the sales and homeowners association responsibilities of the Sunset Hills Subdivision, and would still have to pay employees, subcontractors and professionals to help with the operation. All the while the Trustee would charge hourly for his or her time at rates which customarily range between $200 - $350/hour in this judicial district compared to the $1,000/month plus benefits currently being charged by Debtor's managing partner in the Chapter 11. There would be no savings realized in a Chapter 7 with respect to professional fees in a case such as this where there is no real option to

shut the "business" down; only to incur additional and unnecessary losses, again on account of the unfavorable market expectations and efficiencies of management as described above.

Finally, unsecured creditors would not be entitled in a Chapter 7 liquidation case to the seven percent interest rate proposed under the Plan and general partners would face exposure for shortfalls which are not projected to occur under the Plan.

Thus, while there appears to be sufficient equity to pay all creditors in full and a dividend to interest holders except perhaps in only the worst of worst case scenarios, the proposed Plan provides for a better and more reliable distribution than might be expected by creditors and interest holders alike in a hypothetical Chapter 7 case, and in any event the Plan provides for more favorable treatment to creditors than they would receive in a Chapter 7 liquidation or forced liquidation as demonstrated in this Disclosure Statement.

**Article XV**
**Matters to Consider Before Voting on the Chapter 11 Plan**

A. What is Necessary for Court Approval of a Plan Chapter 11 permits the readjustment of secured debt, unsecured debt and equity interest. A Chapter 11 Plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness, and may even provide some return to equity interest holders absent full satisfaction of indebtedness.

If an impaired class votes against the Plan, implementation of the Plan is still possible so long as the Plan is fair and equitable and the non-consenting class is afforded certain treatment defined by the Code. That certain treatment may be very broadly defined as giving a claimant the "full value" of his claim or interest. Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors. If the latter is equal to or greater than the former, the Plan may be confirmed despite the objection of that dissenting class.

In the event a class is unimpaired, it is automatically deemed to have accepted the Plan. Debtor believes that other than Classes 4 and 6, all classes are impaired (as defined in Section 1124 of the Code) under the Plan. If there is no dissenting class, the test for confirmation of the Plan is whether the Plan is feasible and in the best interests of creditors and interest holders. In simple terms, a Plan is in the "best interests of creditors and interest holders" if the Plan will provide a better recovery to the creditors and interest holders than they would obtain if the Debtors' assets were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities. The Court, in considering this factor, need not consider any other alternative to the Plan but liquidation.

B. Modification of the Plan. The Debtor may propose amendments or modifications to the Plan at any time prior to Confirmation or at the Confirmation hearing, without leave of the Court, upon proper notice. After confirmation, the Debtor may, with the approval of the Court, remedy any defect or omission, or reconcile any inconsistencies in the Plan, or the Order of Confirmation, in such manner as may be necessary to carry out the purposes of the Plan.

C. Alternatives to the Plan. Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against the Plan, and although Creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief reminder of the alternative to the Plan is in order. This alternative includes what would happen in a liquidation of Debtor's assets through conversion of the case to one under Chapter 7. See Liquidation Analysis at Article XIV, above. Debtor believes the proposed Plan to be in the best interest of its creditors for the reasons stated therein.

D. Specific Considerations in Voting. All of the foregoing gives rise to the following implication and risks concerning the Plan. While the Plan provides for certain payments, such payments will apply only to Allowed Claims. Under the Code, a Claim may not be paid until it is "Allowed." A Claim will be "allowed" in the absence of an objection. A Claim to which an objection has been filed will be heard by the Court as a regularly scheduled evidentiary hearing and will be allowed in full or in part or disallowed. Accordingly, payments on all Claims may be delayed until objections to such Claims are ultimately settled.

However, in the event that distributions to a Class of Claims is made at a time that an objection to a Claim within the Class is pending, the funds which would otherwise have been paid through such distribution on account of the Disputed Claim in the event that the Claim was Allowed in full shall be set aside pending resolution of the Objection.

E. Disclosure Required by the Code Before the Plan Can be Confirmed.

The Code requires disclosure of certain facts as follows:

There are no payments or promises made of the kind specified in section 1129 (a)(4)(A) of the Code (related to the identity and promises made to insiders of Debtor) which have not previously been disclosed to the Court. While Debtor is not currently aware of transfers which qualify as "preferences" under 11 U.S.C. section 547(b) and which may be avoided with the Trustee's so-called "strong-arm" powers, he has not carefully analyzed such claims to date and, in any event, all rights to pursue such claims have been expressly reserved in the Plan.

## Article XVI
## Conclusion

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms. Therefore, you are urged to review this material and to make such further inquiries you deem appropriate, and then cast an informed vote on the Plan.

///

///

///

Dated: June 26, 2015

BY: ______________________
ANTONIO RODRIGUEZ III
MANAGING PARTNER, BR ENTERPRISES

**REPRESENTED BY:**

HOLLISTER LAW CORPORATION

By: ______________________
GEORGE C. HOLLISTER
Attorneys for Debtor BR Enterprises

# EXHIBIT "A"

[PRO-FORMA OPERATING BUDGET]

Case 15-21575 Filed 06/26/15 Doc 111

**BR ENTERPRISES**

**STATEMENT OF FORECASTED REVENUE AND EXPENSES**

| FOR MONTH ENDING: | 2/28/2015 | 3/31/2015 | 4/30/2015 | 5/31/2015 | 6/30/2015 | 7/31/2015 | 8/31/2015 | 9/30/2015 | 10/31/2015 | 11/30/2015 | 12/31/2015 | 1/31/2016 | 2/29/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | |
| SALE OF SSH LOTS | | | 93,123 | 136,975 | 21,000 | | | 95,000 | | 144,000 | | | |
| SALE OF CATTLE | | | | 1,013 | | | | | 2,400 | | | | |
| SUNSET HOA FEES | | | 6,509 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 |
| CCRACE BOARDING FEES | | | | 3,432 | 1,264 | | | | | | | | |
| REIMBURSED RECEIVABLES | | 1,380 | 645 | 11 | | | | | | | | | |
| STATE OF CA REFUND (VIA SHASTA) | | | | | | 159,872 | | | | | | | |
| INTEREST | | | | | 181 | | | | | | | | |
| NOTE RECEIVABLE (SHORT TERM) | | | | | 22,000 | | | | | | | | |
| SHASTA ENTERPRISES NOTE REC | | | | | | | | | | | | | |
| GROSS MONTHLY INCOME | - | 1,380 | 100,277 | 144,685 | 47,699 | 163,126 | 3,254 | 98,254 | 5,654 | 147,254 | 3,254 | 3,254 | 3,254 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| ADMINISTRATIVE | | | 28,549 | 29,306 | 23,000 | 23,000 | 23,000 | 23,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 |
| EQUIPMENT RENTAL | | | 28 | 27 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| SUNSET HILLS HOA DUES | | | 2,786 | 2,696 | 2,606 | 2,516 | 2,516 | 2,516 | 2,426 | 2,426 | 2,336 | 2,336 | 2,336 |
| DESERT HORIIZONS (INVERNESS) HOA DUES | | | | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 | 695 |
| BANK FEES | | | | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| VET / MEDICATION / Feed | | | | 121 | 500 | | | 75 | | 1,200 | 2,000 | | 125 |
| US TRUSTEE FEES | | | 325 | | | 975 | | | 975 | | | 1,625 | |
| OFFICE / VEHICLE & EQUIP REPAIR | | 243 | 417 | 2,258 | 250 | 225 | 740 | 200 | | 900 | 75 | | 129 |
| BLDG / YARD MAINTENANCE | | 100 | 975 | 5,017 | 250 | 3,000 | 2,500 | 2,500 | 325 | 350 | 250 | 310 | 5,400 |
| UTILITIES / PHONE / INTERNET | | 2,827 | 2,365 | 5,892 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| ACCOUNTING | | | | | | | | 3,000 | | | | | |
| INSURANCE | | | | | | | | | 36,590 | | | | 2,150 |
| REAL PROPERTY TAXES | | | | | | | | | | | 57,000 | | |
| OTHER TAXES/LICENSE FEES | | 70 | 104 | 298 | 31 | 70 | 200 | 35 | 200 | 175 | 126 | | 434 |
| REFUNDABLE DEPOSITS | | 650 | | 9,089 | | | | | | | | | |
| BLDG SECURITY / REIM MLS FEES | | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 |
| RANCH SUPPLIES | | 25 | 156 | | | 60 | 75 | 25 | 30 | 110 | 90 | 25 | 156 |
| BILLED TO OTHERS | | 10 | 636 | 546 | | | | | | | | | |
| TOTAL OPERATING EXPENSES | | 4,250 | 36,666 | 56,276 | 33,691 | 36,900 | 36,085 | 38,405 | 75,600 | 40,215 | 96,931 | 39,350 | 45,784 |
| INCOME (LOSS) FROM OPERATIONS | - | (2,870) | 63,611 | 88,409 | 14,008 | 126,226 | (32,831) | 59,849 | (69,946) | 107,039 | (93,677) | (36,096) | (42,530) |
| **OTHER INCOME (EXPENSES)** | | | | | | | | | | | | | |
| SALE/REFI OF INVERNESS HOUSE | | | | | | | | | | | | | |
| SALE/REFI OF RANCH MAIN HOUSE | | | | | | | | | | | | | |
| SALE/REFI OF MAIN RANCH | | | | | | | | | | | | | |
| 8% CLOSING COSTS/BROKERS FEES | | | | | | | | | | | | | |
| INCOME (LOSS) BEFORE TAXES | - | (2,870) | 63,611 | 88,409 | 14,008 | 126,226 | (32,831) | 59,849 | (69,946) | 107,039 | (93,677) | (36,096) | (42,530) |
| AP PAYMENTS TO CURTO (1) | | | | | | | | | (2,766) | (2,677) | (2,766) | (2,766) | (2,587) |
| AP PAYMENTS TO CVCB (2) | | | | | | | | | (8,340) | (8,071) | (8,340) | (8,340) | (7,801) |
| AP PAYMENTS TO RBC (3) | | | | | | | | | (8,658) | (8,379) | (8,658) | (8,658) | (8,100) |
| PAYOFF CURTO LOAN / INVERNESS | | | | | | | | | | | | | |
| PAYOFF CVCB LOAN / MAIN HOUSE | | | | | | | | | | | | | |
| PAYOFF OF RBC LOAN / MAIN RANCH | | | | | | | | | | | | | |
| PAYOFF OF UNSECURED CREDITOR / INTEREST | | | | | | | | | | | | | |
| K-1 TAX RESERVE | | (40,000) | | | (40,000) | | | (10,000) | | (20,000) | | | |
| **NET INCOME (LOSS) - AGGREGATE** | - | (42,870) | 63,611 | 88,409 | (25,992) | 126,226 | (32,831) | 49,849 | (89,710) | 67,912 | (113,441) | (55,860) | (61,018) |
| RETAINER DEPOSIT - HOLLISTER LAW CORP | 96,718 | | | | | | | | | | | | |
| RETAINER DRAW - HOLLISTER LAW CORP | | | | | | | (40,000) | (10,000) | (10,000) | (1,500) | (1,500) | (1,500) | (1,000) |
| **AVAILABLE FUNDS** | 263,462 | 220,592 | 284,203 | 372,612 | 346,620 | 472,846 | 400,015 | 439,864 | 340,154 | 406,566 | 291,625 | 234,265 | 172,247 |

(1) Prin of $558,651 @ 7% from 2/1/14 - 2/27/15 ($41,891)Pre-Petition / 5.25% from 2/28/15 - 9/30/15 ($17,276) Post-Petition / $2,500 attorney fees= $620,319

(2) Prin of $1,772,895 @ 5.25% from 1/6/15 - 2/27/15 ($13,703)Pre-Petition / 5.25% from 2/28/15 - 9/30/15 ($55,588) Post-Petition / $2,500 attorney fees = $1,844,685

(3) Prin of $1,802,437 @ 5.25% from 9/23/14 - 2/27/15 ($41,268)Pre-Petition / 5.25% from 2/28/15 - 9/30/15 ($56,514) Post-Petition / $15,000 attorney fees = $1,915,219

| 3/31/2016 | 4/30/2016 | 5/31/2016 | 6/30/2016 | 7/31/2016 | 8/31/2016 | 9/30/2016 | 10/31/2016 | 11/30/2016 | 12/31/2016 | 1/31/2017 | 2/28/2017 | 3/31/2017 | 4/30/2017 | 5/31/2017 | 6/30/2017 | 7/31/2017 | 8/31/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 126,000 | | | | 96,000 | | | 142,000 | | | 165,000 | | | | | 139,000 | |
| | | | 1,020 | | | | | | | | | | | | | | |
| 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 |
| 3,254 | 129,254 | 3,254 | 4,274 | 3,254 | 99,254 | 3,254 | 3,254 | 145,254 | 3,254 | 3,254 | 168,254 | 3,254 | 3,254 | 3,254 | 3,254 | 142,254 | 3,254 |
| 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 |
| 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| 2,336 | 2,336 | 2,217 | 2,217 | 2,217 | 2,217 | 2,157 | 2,157 | 2,157 | 2,067 | 2,067 | 2,067 | 1,977 | 1,977 | 1,977 | 1,977 | 1,977 | 1,877 |
| 695 | 695 | | | | | | | | | | | | | | | | |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| 45 | | | 500 | | | 75 | | 1,200 | 2,000 | | 125 | 45 | | | 500 | | |
| | 975 | | | 1,625 | | | 1,625 | | | 1,625 | | | 975 | | | 1,625 | |
| 417 | 800 | 250 | 225 | 740 | 200 | | 900 | 75 | | | 129 | 417 | 800 | 250 | 225 | 740 | 200 |
| 385 | 325 | | 150 | | | 60 | | 575 | | 160 | 400 | 35 | | | 300 | 60 | |
| 18,000 | 6,000 | 5,500 | 5,500 | 5,500 | 5,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| | | 3,000 | | | | | | | | | | | | 3,000 | | | |
| | | | | | | | 27,290 | | | | 2,150 | | | | | | |
| | 58,000 | | | | | | | | 32,100 | | | | 32,100 | | | | |
| | 367 | 101 | | | | 35 | | 174 | 126 | | 434 | 70 | 367 | 101 | | | |
| | | (650) | | | | (9,089) | | | | | | | | | | | |
| 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 |
| | 60 | | 75 | 25 | 30 | 110 | 90 | 45 | 130 | 25 | 156 | | 60 | | 75 | 25 | 30 |
| 50,237 | 97,917 | 38,777 | 37,026 | 38,466 | 36,306 | 23,207 | 61,921 | 34,085 | 66,282 | 33,736 | 35,320 | 32,403 | 66,138 | 35,187 | 32,936 | 34,286 | 31,966 |
| (46,983) | 31,337 | (35,523) | (32,752) | (35,212) | 62,948 | (19,953) | (58,667) | 111,169 | (63,028) | (30,482) | 132,934 | (29,149) | (62,884) | (31,933) | (29,682) | 107,968 | (28,712) |
| | 775,000 | | | | | | | | | | | | | | | | |
| | | | | | 3,250,000 | | | | | | | | | | | | |
| | (60,000) | | | | (256,000) | | | | | | | | | | | | |
| (46,983) | 746,337 | (35,523) | (32,752) | (35,212) | 3,056,948 | (19,953) | (58,667) | 111,169 | (63,028) | (30,482) | 132,934 | (29,149) | (62,884) | (31,933) | (29,682) | 107,968 | (28,712) |
| (2,766) | (2,677) | | | | | | | | | | | | | | | | |
| (8,340) | (8,071) | (8,340) | (8,071) | (8,340) | (8,340) | | | | | | | | | | | | |
| (8,658) | (8,379) | (8,658) | (8,379) | (8,658) | (8,658) | (8,379) | (8,658) | (8,379) | (8,658) | (8,658) | (7,820) | (8,658) | (8,379) | (8,658) | (8,379) | (8,658) | (8,658) |
| | (620,319) | | | | | | | | | | | | | | | | |
| | | | | | (1,844,685) | | | | | | | | | | | | |
| | (40,000) | | | | (490,000) | | | (10,000) | | | (20,000) | | | | | (20,000) | |
| (66,747) | 66,891 | (52,521) | (49,202) | (52,210) | 705,265 | (28,332) | (67,325) | 92,790 | (71,686) | (39,140) | 105,114 | (37,807) | (71,263) | (40,591) | (38,061) | 79,310 | (37,370) |
| (1,000) | (750) | (750) | (750) | (500) | (500) | (500) | | | | | | | | | | | |
| 104,500 | 170,641 | 117,370 | 67,418 | 14,708 | 719,473 | 690,641 | 623,316 | 716,106 | 644,420 | 605,280 | 710,394 | 672,587 | 601,324 | 560,733 | 522,672 | 601,982 | 564,612 |

| 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 | 3/31/2018 | 4/30/2018 | 5/31/2018 | 6/30/2018 | 7/31/2018 | 8/31/2018 | 9/30/2018 | 10/31/2018 | 11/30/2018 | 12/31/2018 | 1/31/2019 | 2/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 110,000 | | | | | | | | 95,000 | | | | 126,000 | | | | |
| | | | | | | | 150,000 | | | | | | | | | | |
| 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | | | | | | | | | | |
| 3,254 | 113,254 | 3,254 | 3,254 | 3,254 | 3,254 | 3,254 | 153,254 | - | 95,000 | - | - | - | 126,000 | - | - | - | - |
| 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | | | | | | | | | | |
| 1,877 | 1,877 | 1,797 | 1,797 | 1,797 | 1,797 | 1,797 | 1,797 | 1,797 | 1,797 | 1,707 | 1,707 | 1,707 | 1,707 | 1,617 | 1,617 | 1,617 | 1,617 |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| 75 | | 150 | 1,200 | | 125 | 45 | 750 | | | | | | | | | | |
| | 975 | | | 975 | | | 975 | | | 1,625 | | | 975 | | | 1,625 | |
| | 900 | 75 | | 425 | | 80 | 1,000 | | | | | | | | | | |
| 500 | | 150 | 400 | 35 | 75 | | 400 | | | | 225 | | | 170 | | | 85 |
| 1,500 | 1,500 | 1,500 | 1,500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| | | | | | | | | 4,000 | | | | | | | | | |
| | 27,290 | | | | 2,150 | | | | | | | | 8,000 | | | | 2,150 |
| | | | 32,100 | | | | 20,000 | | | | | | | | 20,000 | | |
| 35 | | 174 | 126 | | 434 | | 367 | 101 | | | | | | 174 | | | |
| 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 |
| 110 | 90 | 45 | 130 | 25 | 156 | | 250 | | | | | | | | | | |
| 32,456 | 60,991 | 32,250 | 65,612 | 32,116 | 33,596 | 30,781 | 54,398 | 16,729 | 12,628 | 14,163 | 12,763 | 12,538 | 21,513 | 12,792 | 32,448 | 14,073 | 14,683 |
| (29,202) | 52,263 | (28,996) | (62,358) | (28,862) | (30,342) | (27,527) | 98,856 | (16,729) | 82,372 | (14,163) | (12,763) | (12,538) | 104,487 | (12,792) | (32,448) | (14,073) | (14,683) |
| | | | | | | | 4,100,000 | | | | | | | | | | |
| | | | | | | | (328,000) | | | | | | | | | | |
| (29,202) | 52,263 | (28,996) | (62,358) | (28,862) | (30,342) | (27,527) | 3,870,856 | (16,729) | 82,372 | (14,163) | (12,763) | (12,538) | 104,487 | (12,792) | (32,448) | (14,073) | (14,683) |
| (8,379) | (8,658) | (8,379) | (8,658) | (8,658) | (7,820) | (8,658) | (8,380) | | | | | | | | | | |
| | | | | | | | (1,915,219) | | | | | | | | | | |
| | (10,000) | | | | | | (500,000) | | | | | | | | | | |
| (37,581) | 33,605 | (37,375) | (71,016) | (37,520) | (38,162) | (36,185) | 1,447,257 | (16,729) | 82,372 | (14,163) | (12,763) | (12,538) | 104,487 | (12,792) | (32,448) | (14,073) | (14,683) |
| 527,031 | 560,636 | 523,261 | 452,245 | 414,725 | 376,563 | 340,378 | 1,787,635 | 1,770,906 | 1,853,278 | 1,839,115 | 1,826,352 | 1,813,814 | 1,918,301 | 1,905,509 | 1,873,061 | 1,858,988 | 1,844,305 |

| 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 | 7/31/2019 | 8/31/2019 | 9/30/2019 | 10/31/2019 | 11/30/2019 | 12/31/2019 | 1/31/2020 | 2/28/2020 | 3/31/2020 | 4/30/2020 | 5/31/2020 | 6/30/2020 | 7/31/2020 | 8/31/2020 | 9/30/2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 154,000 | | | | | 124,500 | | | | | 165,000 | | | | | 140,000 | | |
| - | 154,000 | - | - | - | - | 124,500 | - | - | - | - | 165,000 | - | - | - | - | 140,000 | - | - |
| 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| 1,617 | 1,617 | 1,527 | 1,527 | 1,527 | 1,527 | 1,527 | 1,437 | 1,437 | 1,437 | 1,437 | 1,437 | 1,347 | 1,347 | 1,347 | 1,347 | 1,347 | 1,257 | 1,257 |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| | 975 | | | 1,625 | | | 975 | | | 1,625 | | | 975 | | | 1,625 | | |
| | | 750 | | | | 400 | | | 60 | | 190 | | | 400 | | | 325 | |
| 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| | | | | | | | 8,000 | | | | 2,150 | | | | | | | |
| | 19,500 | | | | | | | | 19,000 | | | | 19,000 | | | | | |
| 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 |
| 12,448 | 32,923 | 13,108 | 12,358 | 13,983 | 12,358 | 12,758 | 21,243 | 12,268 | 31,328 | 13,893 | 14,608 | 12,178 | 32,153 | 12,578 | 12,178 | 13,803 | 12,413 | 12,088 |
| (12,448) | 121,077 | (13,108) | (12,358) | (13,983) | (12,358) | 111,742 | (21,243) | (12,268) | (31,328) | (13,893) | 150,392 | (12,178) | (32,153) | (12,578) | (12,178) | 126,197 | (12,413) | (12,088) |
| (12,448) | 121,077 | (13,108) | (12,358) | (13,983) | (12,358) | 111,742 | (21,243) | (12,268) | (31,328) | (13,893) | 150,392 | (12,178) | (32,153) | (12,578) | (12,178) | 126,197 | (12,413) | (12,088) |
| (12,448) | 121,077 | (13,108) | (12,358) | (13,983) | (12,358) | 111,742 | (21,243) | (12,268) | (31,328) | (13,893) | 150,392 | (12,178) | (32,153) | (12,578) | (12,178) | 126,197 | (12,413) | (12,088) |
| 1,831,857 | 1,952,934 | 1,939,826 | 1,927,468 | 1,913,485 | 1,901,127 | 2,012,869 | 1,991,626 | 1,979,358 | 1,948,030 | 1,934,137 | 2,084,529 | 2,072,351 | 2,040,198 | 2,027,620 | 2,015,442 | 2,141,639 | 2,129,226 | 2,117,138 |

10/31/2020

3,247,395

3,247,395

10,000

1,257

6

975

500

6,000

325

19,063

3,228,332

3,228,332

(150,000)

3,078,332

5,195,470